JUDGE BATTS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
TODD BROWN, ENRIQUE COSS, ALEXIS COSS, and
FRANK RUSSO,

13 CV 1002

                              Plaintiffs,

**COMPLAINT**

          -against-

**DEMAND FOR TRIAL BY JURY**

THE WOODLAWN CEMETERY, a Not-for-Profit
corporation, JOHN P. TOALE, JR., Individually, and in his
capacity as a member of the Board of Directors of THE
WOODLAWN CEMETERY, EDWARD MARKIEWICZ,
DONALD WILLIAMS, MITCH ROSE, and ROBERT
SCHEER,



RECEIVED
FEB 13 2013
U.S.D.C. S.D. N.Y.
CASHIERS

                              Defendants.
-------------------------------------------------------------x

     Plaintiffs, TODD BROWN, ALEXIS COSS, ENRIQUE COSS, and FRANK RUSSO, by

and through their attorneys, Eisner & Mirer, P.C., as and for their complaint against defendants,

THE WOODLAWN CEMETERY ("Woodlawn"), JOHN P. TOALE, JR., individually, and in his

capacity as a member of the Board of Directors of THE WOODLAWN CEMETERY, EDWARD

MARKIEWICZ, DONALD WILLIAMS, MITCH ROSE, and ROBERT SCHEER, allege as

follows:

## NATURE OF THE ACTION

1.     This is an action brought to remedy an egregious case of continuous racially hostile

work environment, discrimination in employment on the basis of race, color, and ethnicity, and

retaliation for protected activities in violation of 42 U.S.C. §1981, 42 USC §2000e *et. seq.,* New

York Exec. §290 *et. seq.*, and New York City Administrative Code §§8-101 *et. seq.* This action

also seeks to remedy discrimination and retaliation on the basis of disability under New York

1

Exec. §290 *et. seq.*, and New York City Administrative Code §§8-101 *et. seq.*

2.       The action seeks declaratory and injunctive relief and compensatory and punitive damages both to secure future protection and to redress the past deprivation of rights secured to plaintiffs under these local, state and federal laws.

3.       Defendants have discriminated against minority employees at Woodlawn in violation of the aforementioned federal, state and local anti-discrimination laws in the following ways:

> a)       Subjecting workers of color, including plaintiffs Todd Brown, Enrique Coss and Alex Coss to an ongoing and pervasive racially hostile work environment through the repetitive use by co-workers and supervisors of various epithets and slurs, including but not limited to "n----r," "sambo," monkey, gorilla, spear-chucker, "mutts," "Chicos," and "Josés."

> b)       Defendants have failed to provide equal access to promotions to minority employees including plaintiffs;

> c)       Defendants have failed to provide equal access to overtime pay for minority employees, including plaintiffs;

> d)       Defendants have created and fomented a hostile work environment by promoting racial division within the ranks of the workers, by failing to investigate or otherwise address workplace harassment against minority employees, including plaintiffs, by co-workers and supervisors; and

> e)       Defendants have retaliated against plaintiffs for protected activities, including 1) bringing the above mentioned conditions to management's

2

attention both verbally and in writing, 2) filing charges with the Equal Employment Opportunities Commission (EEOC) and the National Labor Relations Board. (NLRB), and 3) bringing their concerns regarding racism and retaliation to the attention of the leaders in the surrounding community who engaged in protests in support of efforts to end discrimination. Frank Russo corroborated claims of discrimination and hostile work environment made by the minority workers including plaintiffs. This retaliation included, but was not limited to, assigning those who raised concerns of discrimination to the most physically demanding jobs, and "over-supervision"[1] which resulted in injuries requiring plaintiffs to have surgery or take other time off to address the injuries, and refusals to accommodate them upon their return to work resulting in further injury. Plaintiffs, as a result, lost pay and suffered significant psychological stress. In the case of Frank Russo, management retaliated against him by taking him from a job he had held for years and which he was able to do with his disability of a brain tumor and forcing him to work in conditions that were deleterious to his health resulting in his being forced to go on disability leave and eventually retire.

## JURISDICTION AND VENUE

4.         Plaintiffs' claims arise in part under 42 U.S.C. §1981. This Court has jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. §§1331 and 1337, and has supplemental

---

1   Defendants would "over-supervise" plaintiffs by scrutinizing their work at a higher level than that of other workers, not allowing them breaks for activities such as using the restroom or drinking water, and generally applying a higher level of criticism to them than to other employees.

jurisdiction over plaintiffs' State and City claims pursuant to 28 U.S.C. §1367. Venue is proper in the Southern District of New York under 29 U.S.C. §1391, as the majority of events giving rise to these claims occurred within this District.

5.        Plaintiff Brown filed a timely charge of race discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act, 42 USC §2000e *et. seq.,* with the Equal Employment Opportunity Commission on April 8, 2012, and received a Notice of Right to Sue dated November 16, 2012, attached hereto as Exhibit A. His EEOC charge raised claims not only for himself, but for the other named plaintiffs.

**PARTIES**

6.        Plaintiff Alexis Coss (A. Coss) is a 36-year old Hispanic male of Puerto Rican descent. A. Coss began working at Woodlawn on or about September 28, 2003. He held the title of Security Officer from September 28, 2003 until on or about January 9, 2006. He held the title of General Employee from on or about January 9, 2006 until he was laid off indefinitely on or about May 24, 2012. A union grievance regarding his lay off is pending decision from an arbitrator.

7.        Plaintiff Enrique Coss (E. Coss) is a 40-year old Hispanic male of Puerto Rican descent. E. Coss began working at Woodlawn on or about May 9, 2005. He held the title of General Employee from that date until on or about July of 2010 when he became a Heavy Equipment Operator. E. Coss is the brother of A. Coss. He has been out of work on worker's compensation due to injuries since October 19, 2012.

8.        Plaintiff Todd Brown (Brown) is a 44-year old African-American male. Brown began working at Woodlawn on or about June 6, 2005 as a General Employee. He later obtained

4

the tile of Medium Equipment Operator, which he held until he was laid off indefinitely on or about May 24, 2012. A union grievance regarding his lay off is pending decision from an arbitrator. Brown suffers from carpal tunnel syndrome in his right wrist due to repeated use of equipment as described below.

9.       Plaintiff Frank Russo (Russo) is a 52-year old Caucasian male. Russo began working at Woodlawn in or around 1976 as a General Laborer. He was promoted to Crematory Operator in 1999. Russo suffers from a brain tumor that causes intermittent symptoms. After Russo opposed racial discrimination at Woodlawn, defendants retaliated against him in a manner which significantly contributed to the worsening of his condition which required him to take disability leave. Unable to survive on disability alone, Russo was forced to retire from Woodlawn on or about February 1, 2013 in order to receive his pension and social security disability benefits.

10.       The Woodlawn Cemetery (Woodlawn) is a not-for-profit corporation which operates a cemetery and a crematory on its premises. It was established in 1863 and, from its inception, has been located at Webster Avenue & East 233rd Street, Bronx, New York 10470. Upon information and belief, Woodlawn maintains a staff of approximately 60 employees, and independent contractors, including employing its own security staff.

11.       Upon information and belief, defendant John Toale, Jr. ("Toale") is and has been Woodlawn's president for all relevant dates.

12.       Upon information and belief, defendant Edward Markiewicz ("Markiewicz") is and has been Woodlawn's Director of Human Resources for all relevant dates.

13.       Upon information and belief, defendant Donald Williams ("Williams") was

5

Woodlawn's Superintendent until 2007. In 2007, he began to take over the duties of Vice President, and he held both the titles of Vice President and Superintendent until 2009. After having stepped down as Vice President and Superintendent in 2009 he continued to provide services to Woodlawn as a "consultant."

14.      Upon information and belief, defendant Robert Scheer ("Scheer") is or was Woodlawn's Assistant Superintendent for all relevant time periods after Williams stopped performing that job in 2009.

15.      Upon information and belief, defendant Mitch Rose ("Rose") has been Woodlawn's Vice President for all relevant time periods after Williams ended his tenure as Vice President.

## SIGNIFICANT OTHER PERSONS MENTIONED IN THE COMPLAINT, THOUGH NOT DEFENDANTS

16.      Vincent Minnelli, Rocco Popoli, Barry Wyman, Joseph Triptree, Anthony Rotella, Anthony Amato, Kathleen Doran, Bill Meritz, and Tibor Horvath are or were Foremen employed by Woodlawn during the relevant time periods.

17.      Luis Berrios, John DeLuise, John Figel, John Bishop, Charles Weikum, John McLaughlin, Michael Miele, Richard Schmidt, Justin Nocerino, Dominick Bartolini, Richard Schmidt, Darren Edwards, Chris Schumacher, Hugo Vaquero, Amari Aciaro, Julio Cedeño, Matthew Kocher, Robert Donlon, Matthew Hall, Rademas Irizzary, Thomas Torrez and William Peterson are current or former employees of Woodlawn for relevant dates and worked alongside plaintiffs Brown, A. Coss, and E. Coss.

18.      Ed Kane, Anthony Lopez, and John Gurciello are former employees of Woodlawn.

19.      Paul May is or was the Security Director at Woodlawn for relevant dates.

20.      J.R. Torrez and Mila Akilov are or were Security Officers at Woodlawn for relevant

6

dates.

21.         David Melendez was a Security Officer who then became a General Employee in or around 2006.

22.         For all relevant time periods, employees at Woodlawn were represented by a union. From the beginning of plaintiffs' employment, they were represented by United Service Workers Union (USWU), Locals 74 and then Local 811. From around December 2010 to the present they are represented by the Teamsters Union, Local 808. During all relevant time periods, employees and management were parties to a Collective Bargaining Agreement (CBA) which provided that employees could not be fired without just cause. Under the CBA in effect through December 31, 2010, assignments would be made based on seniority. Workers were organized into departments, and the CBA dictated that overtime was supposed to be rotated among employees in a department whenever the type of work that that department performed required extra hours. However, management did not follow the CBA and instead assigned overtime in a manner that favored Caucasian employees. Promotions were also to be made through posting and the most senior employee was to receive the promotion, and if they had not performed that job before management would train them. The current CBA, in effect until December 31, 2013, eliminated the overtime-rotation provisions and reorganized employees into "classifications." Management continued to assign overtime in a discriminatory fashion.

## BACKGROUND FACTS FOR A. COSS: RETALIATION FOR OPPOSING SEXUAL HARASSMENT

23.         A. Coss was first hired by Woodlawn in or around September of 2003. He worked in the security department. He continued to work as a Security Officer without incident until in or around July of 2005.

7

24.     In or around July of 2005, Security Director Paul May ("May") asked A. Coss to help him play a prank on female Security Officer Mila Akilov ("Akilov"). May asked A. Coss to tell Akilov that Woodlawn is "laying people off" and to ask her "what she is willing to do to keep her job and she better say 'I am willing to sleep with Paul May.'" A. Coss refused as he believed he was being asked to request sexual favors from Akilov on May's behalf.

25.     Akilov later left Woodlawn and filed a claim of sexual harassment against May. A Coss gave a statement during the course of the investigation of Akilov's complaint accurately describing May's behavior and his request that A. Coss deliver a proposition for him.

26.     After A. Coss gave his statement regarding the Akilov incident, May and J.R. Torrez ("Torrez") began subjecting him to harassment. Additionally, May reduced A. Coss ' overtime greatly and changed his hours of work from week to week.

27.     Because of this retaliatory harassment, A. Coss requested, and was granted, a transfer to field operations in or around January 2006. Upon information and belief, he was granted this transfer rather than being fired for his protected activity because he was friendly with then-Vice President, Steve Sloane, who had not approved of the actions against Akilov and who left shortly after A. Coss' transfer. On information and belief, other supervisors and Woodlawn employees were made aware that A. Coss gave a statement corroborating that Paul May had made the request for sexual favors from Mila Akilov.

28.     On April 10, 2006, A. Coss was injured while using a "walk-behind" mower due to the grip gears being too wide for his hands. A. Coss told foreman Vincent Minelli about the problem with the gear grips. It was customary for foremen to instruct the mechanics to adjust the workers' equipment so as to be useable, but mechanic Charles Weickum, always claimed he was

8

too busy and refused to make the adjustments. Mr. Weickum was known to be friendly with Paul May and knew that A. Coss had provided information against May. There is no legitimate reason why Mr. Weickum would not adjust A. Coss' equipment other than his anger at A. Coss for speaking truthfully during the investigation of Akilov's complaint against May. Though A. Coss made Minelli aware that mechanic Weickum would not adjust the gears, Minelli took no action to ensure the gears were adjusted. As a result, A. Coss was forced to continue pushing the walk-behind mower with his hands in an awkward position, which led to him develop a ganglion in his right wrist, which caused intense pain in his forearm. He was out of work from January of 2007 to March of 2007, receiving surgery, and then physical therapy, to recover from this injury.

## FACTS SUPPORTING HOSTILE WORK ENVIRONMENT FOR PLAINTIFF'S A. COSS, E. COSS AND T. BROWN AS WELL AS DISCRIMINATION AND RETALIATION 2008-2010

29.     Throughout the relevant time foreman Rocco Popoli ("Popoli"), as well as certain coworkers of the plaintiffs, routinely subjected minority employees to racial harassment and a racially hostile work environment. The harassment was constant and unrelenting, including but not limited to:

> a)     The use of racial slurs such as, "n-----r," "sambo," "spearchucker" "*moulignon*" (an Italian epithet equivalent to the American "n-----r"), "eggplant," "sunshine" or "smiley" (referring to an African-American person being so dark their teeth looking bright as sunshine when they smile), "spic," and "pineapple" (referring to Hispanic workers being from tropical countries;
>
> b)     Calling all Hispanic workers "José" or "Chico" rather than using their names; and

9

c)     Calling African-American employees gorillas or monkeys.

While allegations in this Complaint enumerate several specific severe instances of discriminatory and retaliatory behavior, the racial harassment and use of the above language which created a racially hostile work environment was so ongoing that being subject to this verbal abuse became a term and condition of Plaintiffs A. and E. Coss and T. Brown's employment which they had to endure in order to continue working.

30.     If any people of color complained to management about discrimination or the use of racially offensive language, management would retaliate against them. This resulted in an environment where many minority employees learned to tolerate the pervasive racism and not complain. Plaintiffs also tried not to complain because of this, but the blatant discriminatory acts could not be ignored. This was especially true when A. Coss, E. Coss, and Brown were acting as union shop stewards and brought grievances, including discrimination complaints, to management's attention.

31.     Plaintiffs Brown, E. Coss, and A. Coss, held the position of "shop steward," an elected position with the union, at various times during their employment at Woodlawn. One of the tasks of a shop steward was to file grievances with management on behalf of workers, and advocate on the workers' behalf. Brown held the position with USWU Local 811 from February of 2008 until January of 2009, and then was a shop steward with Teamsters Local 808 from August of 2010 until November of 2011. A. Coss was a shop steward under USWU Local 811 from September of 2008 until January of 2009. E. Coss was a shop steward under Teamsters Local 808 from August of 2010 until November of 2011.

32.     When Brown was elected shop steward of United Service Workers Union's Local

10

811 in February 2008 he began to file grievances on behalf of workers, including those minority workers who complained of racial discrimination.

33.      At all times relevant to the complaint it was the practice of foreman Popoli to segregate employees working under him by race. For example, when a crew was riding to a job site, Popoli would instruct white workers to sit in the cab of the truck, forcing minority workers to sit outside in the bed of the truck.

34.      Popoli would further subject minority workers to over-supervision, following them closely and criticizing their work or berating them for taking necessary breaks, and regularly used the racial epithets mentioned above to refer to African-American and Hispanic workers.

35.      On or about March 6, 2008, management held a meeting with workers to discuss various issues, including safety and sexual harassment training. During that meeting, various workers, including E. Coss, spoke up about Popoli's behavior. They did not mention his racism, but instead focused on his reckless driving and habitual cutting of corners, which jeopardized workers' safety.

36.      On or about March 25, 2008, due to the concerns voiced by workers at the March 6 meeting, another meeting was held between the workers and management, represented by Robert Scheer and Ed Markiewicz, in order to address complaints about Popoli. At this meeting, A. Coss spoke up, telling them that, "You have a racist on the loose" and referenced a time when Popoli had referred to Brown as a "spearchucker." After making this statement, A. Coss heard someone behind him say, "You're gonna get hard work now!" Also at that meeting, the, Backhoe Operator Ray Vicens, who is Hispanic, said, "There's a lot of stuff that goes on that we don't complain about, but it could cause a slow-down."

37.        Shortly after this meeting, both A. Coss and E. Coss began to be assigned to solitary and strenuous labor assignment, widely regarded by employees at Woodlawn to be less desirable. For example, A. Coss was assigned to grass-trimming, using a weed-whacker[2], an entry level job, whereas before he had been assigned to the walk-behind mower. E. Coss was given the job of moving headstones by hand. Upon information and belief, A. Coss was given his assignment because of his protest of Popoli's racial harassment, and E. Coss was retaliated against because he spoke up on March 6, 2008 and also because he is A. Coss' brother.

38.        Upon information and belief, management did nothing to investigate   or otherwise address complaints brought forward by plaintiffs about racism among the foremen.

39.        About this time in 2008 when Brown, A. Coss, and E. Coss began to bring issues of racial harassment and discrimination to management's attention, an unknown employee hung a noose from a beam in the locker room. At the time of this incident, Darren Edwards, an African-American employee, became extremely upset. Other coworkers attempted to calm him down, and discouraged him from reporting the incident to management.

40.        When an assignment opened up in a department, it was a practice at Woodlawn for the job assignment to be posted on the premises. Employees would be permitted to "bid" for the assignments by signing their name to the paper advertising the position. Pursuant to the Collective Bargaining Agreement, the assignment was to be awarded to the most senior employee who was both qualified for and interested in the position. It was also management's practice to train employees in the use of the equipment to be used in new jobs.

---

2   The "weed-whackers" or "string-trimmers" used at Woodlawn are gas-powered, hand-held pieces of equipment. When running, they vibrate, requiring constant use of wrist and hand muscles to keep them still. Weed-whacking assignments are considered the "lowest of the low" at Woodlawn. Ed Markiewicz himself told workers that it was the most labor-intensive position at Woodlawn, and was for entry-level workers.

41.      In early May of 2008, a little more than a month after the meeting in which Ray Vicens spoke up about racism and suggested that work might slow down if nothing was done, he was fired. His position of Backhoe Operator was therefore open.

42.      The Backhoe Operator position was posted shortly after Vicens was fired. Twelve workers applied for the position. At first, the most senior employee who applied was Justin Nocerino, a Caucasian employee. To plaintiffs' knowledge, management did not plan to hire from outside. Neither did the posting state any type of certification that a Backhoe Operator would have to have. After Frankie Dominguez, a Hispanic employee, applied for the position and was the most senior applicant, management began to state that the Backhoe Operator would have to be certified.[3] Dominguez was additionally told that the Backhoe Operator would have to speak "proper English." (Dominguez speaks English fluently with a Spanish accent.) Using the lack of certification as an excuse, management hired a Caucasian worker, Sean Wynne, from outside Woodlawn to take the Backhoe position instead of promoting Dominguez. After Wynne began working, plaintiffs discovered that he was not a certified backhoe operator, as management had represented.

43.      In or around June of 2008, Scheer told A. Coss that he did not like it when people complained about racism. He denied that there was any racism at Woodlawn, and stated that he wanted to "get rid of the loud ones" and that Brown was one of the "loud ones." He later approached Brown and told him, "I hate Alex [A. Coss]." He then told Brown that William Peterson, an African-American employee, was complaining of racism, and said, "You need to go

---

3        While a certification is required to operate a backhoe on public streets, it is not required to operate one on private property, such as Woodlawn. To obtain certification, the operator would have to obtain a permit from the city, a process which can cost thousands of dollars. For these reasons, among others, it is Plaintiff's observation that the certification requirement was pretextual.

13

talk to him, I don't want to hear no talk of racism. There is no racism in here."

44.        In or around June of 2008, the Employer Appreciation Picnic was to be held. Williams told Brown that he heard that men were going to protest being passed over for the backhoe position and were threatening not to attend the picnic. He stated, "That is not going to go over well, and we're going to do everything we can to get the guys to go." Brown understood Williams' statement to mean that Williams was going to do everything he could to get the men who protested by not going to the picnic to quit their jobs at Woodlawn. Later that morning, Scheer approached Brown and told Brown that he's been talking to "the guys" and he heard that Todd is "...one of the loud ones in here, and we're going to get rid of the loud ones, the loud ones are causing problems here." Darren Edwards, a coworker then told Brown that, before the picnic, Scheer had told Edwards that being allowed to take days off were considered favors and those things would stop if Edwards participated in the picnic protest. After having heard these things, Brown talked the workers out of the protest.

45.        At around this time, A. Coss began to be the target of graffiti in employee areas that falsely characterized him as homosexual. He found this offensive, and though he made management aware that he was being targeted in his fashion, management did nothing.

46.        On or about July 24, 2008, Brown filed an internal complaint alleging racial harassment, hostile work environment, denial of promotion based on race, and retaliation by management. Brown's complaint did not mention A. Coss by name. However, shortly after it was filed, John McLaughlin, a co-worker, called A. Coss a "white-hater." After the complaint, Brown began to be ostracized by fellow Caucasian employees Charles Weikum, Frank Klatt, and Chris Schumacher.

14

47.        On or about August 5, 2008, McLaughlin reprimanded Lasco, a Caucasian employee, for socializing with A. Coss. McLaughlin said, "You know Spanish people around here don't like white people. Get with the program. Stick with your own kind." Lasco replied, "What if I don't like white people?" McLaughlin responded by calling Lasco "white trash."

48.        In or around August of 2008, after Popoli referred to Brown as a "n-----r". Brown filed an EEOC complaint alleging racial discrimination.

49.        On or about August 27, 2008. A. Coss noticed that someone had scratched his name off a bid list for the job of Vault Cleaner. A. Coss brought this to defendant Scheer's attention but nothing was done to correct this. A. Coss' name continued to be scratched off bid lists. The scratch was not just a cross-out of his name, but a stabbing and tearing off of the paper where he had written his name down. This occurred throughout the rest of his employment at Woodlawn.

50.        On or about September 10, 2008, plaintiff A. Coss brought the issue of racial harassment by his co-workers to defendant Scheer's attention. To plaintiffs' knowledge, management did nothing to investigate or resolve this matter, and the harassment continued.

51.        On or about September 19, 2008, coworker Ricardo Vaquero, a Hispanic employee, informed A. Coss about his concern that he was not getting assigned overtime even though it was practice for white employees in his department to routinely be assigned Saturday overtime, and that union steward Justin Nocerino was siding with management when he filed grievances. Vaquero also told A. Coss about a time when Nocerino had taken management's side during a dispute with Hispanic employee David Melendez. A. Coss at that point decided to run for union steward.

52.        Shortly thereafter A. Coss was elected shop steward.

15

53.        On or about October 16, 2008, an assignment driving a UV4-gator[4], a desirable

assignment, opened up. This assignment was to be filled by seniority in the department. A. Coss

would have been the most senior employee available and qualified to perform this assignment.

Rather than assign A. Coss to the UV4-gator job, management removed Matthew Kocher from

his assignment driving a riding mower to keep A. Coss from receiving this desirable assignment.

Kocher had less seniority than A. Coss.

54.        On or about November 5, 2008, an assignment driving a dump truck, a desirable

assignment, opened up. Rather than assign A. Coss, the most senior, available, and qualified

employee within the department, to this assignment, which would have meant more pay, Scheer

assigned Ricardo Vaquero to drive the truck. At the time, R. Vaquero was not in the proper

employee classification to out-bid A. Coss for the assignment. Upon information and belief,

Scheer asked R. Vaquero to do the assignment out of his department for the sole reason of

preventing A. Coss from getting the assignment. When A. Coss confronted Popoli about this,

Popoli asked A. Coss if he "had a problem" with R. Vaquero. This statement was made in R.

Vaquero's presence, and rather than addressing the contract violation, the statement was made to

pit R. Vaquero against A. Coss.

55.        On or about November 7, 2008, A. Coss, in his capacity as shop steward, brought to

Williams' attention that minority employees were routinely passed over for weekend overtime

and training opportunities. This issue came up after an incident where overtime was given to a

Caucasian maintenance worker rather than a Hispanic back-up mechanic, Luis Berrios.

Customarily, when (as in this situation) the two primary mechanics were not at work on a given

---

4  A "gator" is a piece of equipment resembling a small truck used to transport people and tools from plot to plot
   where traditionally sized motor vehicles do not fit.

16

day, their work would be assigned to the back-up mechanic. However, in this situation, because of Berrios's ethnicity, he was passed over for the overtime in favor of a less qualified Caucasian worker.

56.     On or about November 13, 2008, A. Coss filed a grievance in his capacity as shop steward on behalf of an employee who stated that foreman Minelli was doing bargaining unit work, depriving a bargaining unit employee of hours. Williams told A. Coss that if he kept filing grievances, Williams would "make things chaotic" for him, and threatened to start suspending employees if they came in late or didn't punch out for meals. He told him, "You're the one causing problems here." A. Coss told him that people were afraid to come forward because they feared retaliation. On this date, Anthony Lopez told A. Coss that he heard Williams threaten to suspend employees because of A. Coss' complaints.

57.     On or about November 14, 2008, A. Coss filed an internal complaint alleging retaliation, pervasive racism leading to a hostile work environment, and disparate treatment.

58.     Throughout December of 2008, Brown was continuously passed over for temporary pro gator driving assignments. Despite the fact that contractually the job was to be awarded employees by seniority in classification. In this instance, Brown was the most senior employee in his classification and so should have been given this desirable assignment. However, he was continually passed over for it in favor of employees who, while having greater seniority than Brown, were not in the employee classification in which this assignment existed. A similar situation occurred more than once during this time with regard to a snowplow-driving assignment, also a desirable assignment. It was practice for overtime snowplow-driving to be assigned to employees who were in the classification of the job for which overtime was offered

17

and eligible for overtime. During this time an overtime snowplow-driving assignment was given to two senior employees who were not qualified to drive a snowplow, though Brown was available, qualified, and eligible for overtime.

59.        On or about December 12, 2008, A. Coss was suspended for two days after taking a sick day when he had already used his allotted sick days. Defendant Markiewicz told him that he could use a "once in a lifetime career dire emergency personal day" but that he could never use it again. A. Coss took the suspension instead. Upon information and belief, white employees and/or employees who did not raise issues of racial discrimination were allowed to take such sick and vacation days without fear of reprisal.

60.        On or about December 18, 2008, Brown's knee was hit by a pro-gator driven by a coworker.  He suffered a medial collateral tear, meniscus tear, and ACL scarring on his right knee. Brown returned to work soon after, using a knee brace. Upon returning to work, he requested an accommodation that foreman Popoli assign him to work on level ground rather than a hill, because working on a hill would aggravate his injuries. Popoli assigned him to work on a hill anyway, which aggravated the injuries, requiring Brown to take personal time off of work to recover.

61.        In or around December, 2008, Brown also filed an NLRB charge, alleging that Woodlawn had refused to accept grievances filed by Brown and A. Coss in their capacity as shop stewards, failed to provide information requested by the USWU regarding employee wages, and threatened A. Coss with adverse actions for his support of the union. The charge was signed by Brown, but mentioned A. Coss by name. Thereafter, Woodlawn retaliated against Brown and A. Coss by refusing to give them desirable temporary assignments to which they were entitled by

18

seniority. These assignments were given to less experienced employees with lower seniority.

62.        In or around January of 2009, plaintiffs became aware that management had been fomenting animosity against them among the ranks of their fellow union members. Because of this fomented hostility, plaintiffs Brown and A. Coss were voted out as shop stewards on or about January 12, 2009.

63.        On or about January 22, 2009, Brown, A. Coss and E. Coss, were assigned to sewer duty, an undesirable assignment that involved cleaning out drainage pipes. Foreman Popoli harassed them constantly while they were working on sewer duty.

64.        On or about January 28, 2009, Brown and A. Coss filed an EEOC complaint alleging racial discrimination against minority employees at Woodlawn.

65.        On or about February 6, 2009, the new shop steward, Matthew Kocher told Brown that Brown was on the cemetery's "hit list" because of his discrimination complaints. Kocher then told him that if he stopped complaining, he would get desirable assignments again. Kocher then said that A. Coss, "it would never work" as management would never give him any desirable assignments.

66.        On or about February 23, 2009, Brown filed a charge with the National Labor Relations Board alleging that management had imposed more onerous terms and conditions of employment on him because he had sought to enforce the terms of the Collective Bargaining Agreement via filing grievances.

67.        In or around February, 2009, Brown was required to use his own personal time to treat the injury he received in December as described in Paragraph 60. After returning to work, Brown was regularly passed over for desirable assignments, over-supervised, and subjected to

19

racial harassment by foreman Popoli.

68.         On or about March 17, 2009, A. Coss suffered an injury, hitting his head and hurting his neck, back, and shoulder. Popoli asked why had had stopped working, he replied he was dizzy from hitting his head. Popoli then said, "I don't see you bleeding" and told him to get back to work.

69.         On or about March 22, 2009, while A. Coss was socializing with co-workers Julio Cedeño, Ricardo Vaquero and David Melendez after work. Cedeño asked A. Coss what management had against him, saying, "What did you do that they hate you so much?" A. Coss replied that it had to do with his protests against racism. A. Coss asked Cedeño if he had also observed racism at Woodlawn. Cedeño replied in the affirmative.

70.         On or about April 8, 2009, an incident occurred where Brown agreed to assist plaintiff E. Coss, move a pro-gator. E. Coss, who had more seniority than Brown, had been assigned to drive a pro-gator with an attached trailer that day. E. Coss did not have much experience driving a pro-gator with a trailer and because there was a large amount of traffic at the cemetery, E. Coss asked Brown to move the pro-gator from one area of the plot to another. Brown, who had more experience driving a pro-gator, did so safely. E. Coss informed Popoli when he arrived on the plot that Brown had assisted him. Popoli reacted negatively, pointing to a tire track Brown had left while moving the pro-gator. E. Coss immediately fixed the tire track, but Popoli was still angry about it, saying that he did not want Brown driving the pro-gator.

71.         On or about April 10, 2009, Brown and E. Coss were called into the main office to meet with Scheer and Markiewicz about the pro-gator incident which had occurred two days before. In the presence of the shop stewards, Amari Aciaro and Matt Kocher, Scheer and

20

Markiewicz interrogated Brown and E. Coss about the incident. They then informed Brown that they "didn't want him driving." After this meeting the Union shop stewards, Acario and Kocher, told E. Coss, "Don't worry, they're not after you. They're after Brown because of his complaints."

72.      On or about April 14, 2009, Sean Wynne, the backhoe operator, went on an extended leave for medical reasons, leaving Woodlawn without a backhoe operator. Management refused to train any workers to use the backhoe. Instead, foreman Vinny Minelli operated the backhoe, a bargaining unit job. Upon information and belief, this was done in retaliation for plaintiffs bringing the issues of racism and improper assignment of tasks to management's attention.

73.      As part of Popoli's ongoing campaign of harassment and over-supervision against the plaintiffs, on or about May 4, 2009, he was watching E. Coss work on a plot while driving by in his truck. Because he was watching E. Coss instead of the road, he crashed into Scheer's truck, causing a significant accident.

74.      On or about May 7, 2009, E. Coss filed two grievances, one was for being denied temporary work assignment on the pro-gator; and the second was for the security team performing bargaining unit work. The second grievance stemmed from an instance where security personnel were charged with transporting recently serviced cars from the service yard to the main office, a job supposed to be performed by bargaining unit members. Shortly thereafter, Scheer required E. Coss to provide documentation for a scheduled personal day. E. Coss had never before been asked to provide such documentation nor had any other employee, to plaintiffs' knowledge.

21

75.     On or about May 11, 2009, in an effort to intimidate plaintiffs, Scheer and members of the security team followed Brown and E. Coss throughout the day, circling them in their vehicles and idling by the plots where they were working.

76.     At around this time in 2009, foreman Popoli began to constantly and drastically change plaintiffs' Brown and E. Coss's work assignments from day to day, making it impossible for them to finish tasks. They went to Scheer to tell him what was happening and how it was affecting their work, and Scheer told them they just had to "pick it up."

77.     On or around May 27, 2009, Brown took a restroom break. Foreman Popoli arrived at the plot and asked E. Coss where Brown was. E. Coss replied he had gone to the restroom. Popoli responded, "He shouldn't be using the bathroom, he has work to do!" and left in the direction of the bathroom. Shortly after Brown returned to work at the plot, Scheer and Popoli pulled up in their trucks and began interrogating Brown as to his whereabouts.

78.     On or about May 28, 2009, shop steward Matthew Kocher approached E. Coss and told him that, "[Union Rep.] Mike Herron says that [management] will give you a temporary work assignment to be on the pro-gator if you're willing to drop your grievance." E. Coss did not believe that this suggestion resolved the full grievance.

79.     On or about May 29, 2009, Kocher gave E. Coss his grievance of May 7, 2009 back along with a response from management. E. Coss observed that the language in his grievance had been changed. Kocher had a close personal relationship with Scheer. Kocher told E. Coss that management had asked him to change the language of the grievance, and told him that that was all right since he was the shop steward. Kocher then stated that he would no longer take any grievances from E. Coss.

22

80.        On or about June 14, 2009, Brown was assigned to weed-whacking duty under Popoli's supervision. While other employees working alongside Brown were allowed to take breaks, Popoli did not allow Brown to do so, going as far as to berate Brown every time he stopped to drink water. After five days of constant and prolonged use of the weed-whacker, Brown's right hand had become swollen and extremely painful, as this activity had aggravated his carpal tunnel syndrome. He asked to be re-assigned to a walk-behind mower, a job at which he was proficient, and which would not exacerbate his underlying injuries, and which was compensated at the same rate of pay as the weed-whacking task. Popoli refused to re-assign him to mower duty and Brown's hands were severely injured. Upon information and belief, Popoli over supervised and refused to change his assignment in retaliation for Brown's opposition of racism in the workplace, leading to Brown suffering disabling injuries to his hand.

81.        On or about June 17, 2009, E. Coss was assisting an African-American customer, who was upset because she saw ants on her mother's grave. E. Coss used his equipment to remove the ants. When Popoli observed this, he looked displeased. Popli later chastised E. Coss for using his tools in this manner. Customarily, Popoli was very solicitous of Caucasian customers, but berated Coss for being solicitous of an African-American customer.

82.        On or about June 24, 2009, Brown filed a workplace safety complaint with OSHA, alleging that unsafe working conditions had led to his hand injury. He was forced to take a day off of work to see a doctor, who wrote him a note stating that he could not perform prolonged grass-trimming tasks.

83.        When Brown returned to work, shortly after his doctor's appointment and OSHA complaint, he told Scheer that he believed he had been assigned to grass-trimming in retaliation

23

for his EEOC complaint filed in January, 2009. Scheer disagreed with him. At the end of the meeting, Brown was still assigned to grass-trimming.

84.        On or about June 30, 2009, union shop steward Acciaro filed two grievances on Brown's behalf. The first stated that Scheer reassigned him to grass-trimming in retaliation for his complaints. The second stated that Woodlawn had failed to make reasonable accommodations for his disability, carpal tunnel syndrome. Management denied this grievance.

85.        On or about July 13, 2009, foreman Joe Triptree described Rob Scheer to A. Coss as a "vindictive person."

86.        On or about July 14, 2009, E. Coss was delayed a day returning from vacation. It was practice at Woodlawn for workers who had available accrued vacation and/or personal days to use them so long as they called in before 8:00 A.M. on the day they had to take off. When he spoke to Scheer on the phone upon calling in, Scheer told him he would have to bring a note.

87.        On or about July 15, 2009, when E. Coss returned to work, Scheer again demanded a note excusing his absence the day before. E. Coss could not produce one, so Scheer disciplined him by giving him a "step."[5]

88.        On or about July 17, 2009, E. Coss went to speak with Scheer and the shop stewards Acciaro and Kocher to submit a grievance to Scheer regarding the step.  Scheer was already talking to stewards Acciaro and Kocher in his office at the time E. Coss arrived at the office and Scheer motioned for E. Coss to wait outside. When Scheer came out and E. Coss attempted to speak with him, Scheer became angry and demanded to know why he was not at work. E. Coss replied, "I've been waiting here for half an hour because you told me to. Work hasn't even started

---

5   A "step" is a disciplinary method by which, when an employee missed work when he had not accrued any time off, he would be docked a day's pay.

for me." Scheer then accused him of insubordination. E. Coss replied, "I'm tired of your harassing me, you've been treating me differently ever since I supported Todd [Brown] and my brother." Scheer did not deny this accusation.

89.     On or about July 22, 2009, E. Coss was talking to foreman Barry Wyman. He told Wyman about Scheer giving him a step for using a vacation day. Wyman said, "That's not right. It's always been that as long as you call in before 8:00 A.M. and had the time, it would be OK. Rob [Scheer] has been trying to change the rules around here, you need to watch your back."

90.     On or about July 30, 2009, A. Coss was working on a solitary weed-whacking assignment when Popoli and Scheer followed him across the street from the worksite to where the gas can was left for him to fill his weed-whacker. While getting the gas, Popoli and Scheer drove circles around him in an intimidating fashion.

91.     On or about August 3, 2009, Scheer approached E. Coss when E. Coss was taking notes. E. Coss usually would use a notebook to write down his assignments for the day and document that he had completed them. Scheer saw him writing on a sheet of paper and told him to stop writing and threatened to discipline him. E. Coss put the paper in his pocket and said that he had always taken notes. Scheer then said, "Are you documenting? Stop documenting!" and made a move to snatch the paper from E. Coss's pocket, at which point E. Coss stated, "That's my personal property. Stop harassing me!" Scheer then jumped in his truck and left the site.

92.     On or about August 11, 2009, E. Coss, A. Coss, and Brown were assigned to weed whacking under Popoli's supervision. E. Coss had brought a cooler full of cold water bottles. Hispanic employee, Rademas Irizarry, asked him for a bottle of water because the water provided by Popoli was dirty. Popoli approached the men, and yelled at Irizarry, telling him not

25

to speak to E. Coss. He then sent Irizarry to work alone at another end of the plot. Later that day, Irizarry told E. Coss that Popoli had refused to give him any water after that and that it was because he had spoken to E. Coss.

93.        On or about August 17, 2009, Brown and E. Coss were assigned to weed-whacking. It was a very hot day. When Brown and E. Coss took a break to drink some water Popoli got out of his truck, where he was sitting, and chastised them for taking a break.

94.        On or about August 18, 2009, A. Coss, E. Coss, and Brown were assigned to work in direct sunlight during a hot day. A. Coss began to feel faint and asked to be driven to the hospital, as was common practice at Woodlawn when workers experienced severe illness or injuries. Popoli refused to drive him to the hospital. Instead, Popoli drove him to the work gate of the cemetery. Popoli told him to get a ride from Security Supervisor J.R. Torrez. A. Coss did not want to go with Torrez because Torrez had acted threateningly towards him after the Mila Akilov incident described in Paragraph 24. A. Coss was able to walk to the emergency room, but he was hospitalized with heat stroke and heat exhaustion.

95.        At around this time, there was both a "port-o-potty" and the regular restroom available to the workers, but Woodlawn did not maintain the port-o-potties properly, and they were often filled to the top with human waste. On or about August 27, 2009, Popoli reprimanded E. Coss for using the restroom near the service yard, telling him "Your bathroom is out there," referring to the port-o-potty.

96.        On or about August 31, 2009, Brown and E. Coss asked to be taken to the restroom because the port-o-potty was filled and had not been cleaned in some time, and the weather was extremely hot. Popoli refused to drive them to the restroom, as was customary. Even though E.

Coss made it a habit to use the facilities before being driven to the work site for the day, it was sometimes necessary to use the bathroom during the day. On information and belief, Caucasian workers were driven to the restroom routinely by the foreman.

97.     On or about September 8, 2009, E. Coss was called into the office and accused by Scheer and Markiewicz of being late. He told them that had been between one and five minutes late for several days because he had to use the restroom before being driven to the job site, because he knew he would be forced to use the port-o-potty once there. In response, they told him that he should "control his bowels." E. Coss protested that he was not a machine, and that they were stripping him of a basic right, and that he felt it was retaliatory. Later that day, another port-o-potty was installed near the site at which E. Coss was working that day. From then on, each day, the same port-o-potty would be moved to near whatever job site E. Coss was working at. It would not be cleaned or emptied after it was moved, and so the interior became encrusted with human filth and feces.

98.     On or about December 11, 2009, E. Coss was working outside during inclement weather. He asked Popoli to take him to the restroom. Popoli refused to drive him to the restroom, and took him instead to a "port-o-potty." Popoli refused to drive him to the restroom, and proceeded to use threatening language to him. The port-o-potty continued to be used to segregate and retaliate against employees of color and those that had protested racism. After this incident took place, William Peterson, an African-American employee, said that he would not speak up on E. Coss's behalf because he feared that he would lose his job and he had a daughter to support. He then added, "I'm black and you already know what they're going to do to me."

99.     In December of 2009, it came to E. Coss's attention that, though Scheer had told

27

him and Brown that there was no time to train them to drive a snowplow, Caucasian employee Matthew Kocher, was being trained by Popoli to drive a snowplow even though he had lower seniority than any of the plaintiffs. Because he was then qualified for desirable assignments, Kocher was given overtime over and above that which was given to more senior employees. Upon information and belief, other minority senior employees, including David Melendez, were denied the opportunity to be trained to drive snowplows and so were excluded from overtime and desirable assignments.

100.    Throughout this period plaintiffs and other minority employees were subjected to racial slurs and use of racially offensive language without let-up primarily from Popoli.

## PLAINTIFFS SEEK ASSISTANCE FROM THE COMMUNITY TO ADDRESS RACISM AND RETALIATION AT WOODLAWN: 2010

101.    On or about January 20, 2010, E. Coss met with Kathleen Doran, the CFO, and Edward Markiewicz. He described how Popoli had harassed and threatened him after he had started filing grievances and supporting his brother and Brown's fight against on-the-job discrimination. He specifically told Doran and Markiewicz about Popoli's racial harassment and hostile behavior, and stated that he felt fearful for his safety around Popoli. He also reported that Popoli had been called Brown a "spearchucker." Markiewicz dismissed his complaints by stating that, "Rocco [Popoli] is not a credible threat." The day after this meeting, E. Coss was assigned to work under Popoli again, though he had been working under Minelli between December of 2009 and this time.

102.    In late 2009, the plaintiffs, along with other minority and sympathetic Caucasian employees, began to enlist community support for their cause of ending racial discrimination at Woodlawn. They enlisted the help of an attorney, Ramon Jimenez, who worked with the

Southern Bronx Community Congress (SBCC) which included the Church of the Resurrection. The SBCC heard the information from the workers. Their leaders contacted Woodlawn and began to support the workers with protests.

103.     As a result of community intervention, Woodlawn agreed to conduct an investigation. Attorney Ernest Collazo was hired to conduct the investigation. Attorney. Jimenez was invited to sit in on the interviews.

104.     Shortly after the "investigation" began, Jimenez concluded that this investigation was going to be superficial and not designed to find or remedy the problems he had heard about from his meetings with the workers.

105.     He noted that Collazo did not interview plaintiff A. Coss, despite the fact that it was known that he had brought numerous issues of racism and/or discrimination and retaliation to management's attention.

106.     Jimenez also noticed that Collazo did not ask probing questions of employees to find out what they knew and in fact asked leading questions of employees intended to elicit the response that no racism existed.

107.     For example, Jimenez sat in during an interview of Darren Edwards, an African-American employee. Jimenez was aware due to previous conversations that Edwards had been called "n----r" among other slurs. Collazo never asked Edwards any questions to find out if he had heard any racial epithets. Jimenez interjected a direct question about whether he had heard "n----r" being used against employees. Collazo objected to Jimenez participating in the questioning and asked him to leave.

108.     Jimenez informed plaintiffs Brown and A. and E. Coss that he thought the

29

investigation was going to be a sham.

109.      Nonetheless Plaintiffs E. Coss and Russo were interviewed by Collazo. Each of them provided evidence of the use of racial epithets and their concerns about racism.

110.      On or about July 16, 2010, plaintiffs along with members of the SBCC and other members of the South Bronx community, engaged in a demonstration outside the gates of Woodlawn, protesting discrimination.

111.      On or about August 2, 2010, plaintiffs and other employees learned that Rocco Popoli had been fired. He was replaced by Tibor Horvath ("Horvath"). No reason was given to the workers for Popoli's termination. Toale issued a statement that there would be changes and discrimination would not be tolerated. This statement included what appeared to be a veiled threat to the workers, stating, "We will also be implementing a plan to create far more rigorous documentation on work performance of both supervisors and employees. We are moving to create a clear and unambiguous line of reporting where performance is documented and registered."

112.      On or about October 9, 2010, John Toale announced that the investigation had found no discrimination at Woodlawn for the past two and a half years. Plaintiffs and workers of color were unsatisfied with this result. Even though Popoli had been terminated and the company stated that they would include racial sensitivity training into their yearly sexual harassment training, the employees and community were not satisfied.    In late October another demonstration occurred with the community and the workers. Plaintiff Russo was interviewed by a Daily News reporter at that demonstration. On or about October 24, 2010, Russo was quoted in a Daily News article describing the racism at Woodlawn.

113.     Feeling that they would be better served by being represented by a stronger union, plaintiff's campaigned for and eventually, in or around December 2010, Teamsters Local 808 replaced the USWU as the union representing workers at Woodlawn.

114.     On January 17, 2011, another demonstration occurred with approximately three hundred people, including the plaintiffs, marching around Woodlawn carrying banners opposing racism. Shortly thereafter, management began talking about laying off workers.

115.     On or about March 18, 2011, during a Teamsters meeting where lay-offs were discussed, a coworker stated he heard that the lay-offs were because of Brown, A. Coss, and E. Coss. This resulted in several adverse reactions from coworkers, including:

> a)     John McLaughlin, said that the lay-offs were because, "This guy [Brown] complaining somebody called him a n----r!" He then said that, "They need to get rid of all these f--king mutts." He also called A. Coss a n-----r and threatened to get a baseball bat from his car and bash all their heads in.

> b)     John Bishop stated that "...these people don't need a paycheck because there's fifty of them living in one house." Bishop had to be restrained because he was yelling and moving threateningly towards A. Coss.

> c)     James Davy made a fist at Todd Brown and told him to "keep his f--king mouth shut." Davey then said, "If I get laid off I'm f--king someone up."

> d)     Justin Nocerino stated that "these people" (pointing to A. Coss) "don't need jobs because their wives live off the welfare system. A. Coss attempted to respond, and Nocerino threatened to "hurt him."

Though these threats were reported to Woodlawn management, on information and belief, they

31

did nothing to investigate these threats or discourage any of the employees who made them.

116.     After this meeting, A. Coss reached a breaking point, experiencing intense anxiety and depression. He sought psychological help and has been receiving psychiatric treatment ever since.

117.     On or about April 7, 2011, A. Coss was working with co-worker John DeLuise. DeLuise is the cousin of co-worker John McLaughlin. A. Coss told him about some of the racist things McLaughlin had said. DeLuise told A. Coss that McLaughlin would engage in racist behavior in front of Donnie Williams, such as giving "Nazi salutes" and saying, "Heil Hitler!" He then said that management would never do anything to McLaughlin because he was close with Williams and Scheer.

118.     In or around April 2011, Woodlawn announced layoffs and stated explicitly that it was due to the cost of fighting the discrimination complaints. Before it was known who would be laid off, co-worker John Figel stated that he had "six bullets" for Brown and the Coss brothers. Plaintiffs Brown and the Cosses told Horvath about this threat of bullets. Upon information and belief, nothing was done to investigate this death threats despite management's knowledge of it.

119.     On or about April 14, 2011, the layoffs were officially announced.  Fifteen people were laid off from landscaping functions which were to be taken over by an outside contractor. Foreman Horvath told employees that it should have been Brown and the Cosses laid off because they had made complaints. Horvath told Brown that if it were not for the grievances and complaints there would not have been layoffs, and if there were no more grievances or complaints, there would be no more layoffs. He told Brown to tell A. Coss to stop raising issues

32

or else more layoffs would happen. Plaintiffs A. Coss and Brown were not laid off during this round of layoffs due to seniority, but Horvath told them, "If you keep talking, there'll be ten more gone."

120.     After Horvath had denounced the plaintiffs to their co-workers, they began to be ostracized by their peers. Horvath and other foremen would over-supervise plaintiffs' work.

121.     Around this time, E. Coss sought medical attention for the intense anxiety, headaches, and insomnia he was experiencing due to the stress he was under at Woodlawn. He was diagnosed with depression, and put on medication. Shortly after this, he spoke to Horvath about the harassment, over-supervision, and treatment from other workers. Horvath told him, "Well all you have to do is stop with the complaints, and this will stop."

122.     Shortly thereafter, Brown was given the classification of "medium equipment operator" and assigned to pro gator and leveling jobs. At this time, Horvath told him if "you're not a grievancer" there would be room for advancement.

123.     On or about April 18, 2011, co-worker Dominic Bartolini told A. Coss that it was after the January 17 protest that management decided that they would lay workers off.

124.     On or about April 19, 2011, A. Coss and E. Coss were working to remove debris by hand in the rain. A. Coss injured his back and was out of work until April 28th, 2011.

125.     On or about April 28, 2011, Brown handed Scheer a complaint from A. Coss against Horvath for creating a hostile work environment for Brown and both Coss brothers. Scheer asked Brown if he agreed with it. Brown said that he did.

126.     On or about April 29, 2011, when A. Coss returned from his injury, he was assigned to digging foundations by hand, even though management knew that he had just recovered from

33

a back injury and that this activity was likely to worsen the injury, and he had requested an accommodation not to engage in heavy lifting.

127.     In or around May of 2011, a co-worker called Brown a monkey. Horvath witnessed this and said nothing.

128.     On or about May 2, 2011, Brown was removed from driving the pro-gator and assigned a more strenuous work assignment by Horvath.

129.     In or around May of 2011, Brown heard Horvath and coworker John Deluise always called Scotty, an African-American security guard, "Smiley." He had heard this before and asked why they called him by that nickname. Deluise said, "Because he's so dark, all you see are his teeth when he smiles." Throughout May of 2011, Deluise referred to Brown as a "monkey" and a "gorilla" in front of Horvath, who did nothing about it.

130.     In or around July of 2011, Brown was given the assignment of leveling dirt piles. He noticed that these piles were much larger than those usually left for people doing this job. He told Minelli that the piles were larger than usual, and would contain large rocks and boulders, which made his job more dangerous. Nothing was done about his complaint.

131.     On or about August 2, 2011, Brown was injured while leveling one of these unusually large pile of dirt, tearing his labrum and rotator cuff, an injury which required surgery.

132.     On or about September 3, 2011, Foreman Minnelli assigned employee John Figel to a pro-gator assignment, even though he was not qualified. Upon information and belief, this was done in order to block A. Coss from having this desirable assignment in retaliation for his protected activity.

133.     On or about September 16, 2011 defendant Markiewicz and Vice President Mitch

34

Rose interrogated A. Coss because he needed a day off due to his wife having an emergency on September 14, 2011. Markiewicz and Rose asked him to produce documentation of the emergency. Upon information and belief, Caucasian employees were never required to produce such documentation.

134.    On or about September 20, 2011, Horvath tried to provoke an altercation with E. Coss, following him around asking if he has "something to say to him." A. Coss intervened to stop the confrontation.

135.    On or about September 21, 2011, E. Coss was removed from pro gator duty and assigned to a heavy manual labor assignment, even though he had been put on pro gator duty after having won his bid through standard bidding processes. The other employees who had won their bids at the same time continued to work in the assignments they had bid for and won.

136.    On September 26, 2011, E. Coss took off half a day of personal time that he had requested in advance in order to replace his bank card in advance of going in for surgery on his left wrist for a DeQuervain Syndrome, an ailment caused by inflammation of a tendon in the wrist as a result of overuse of the joint. It was common practice for employees to be allowed to take unused personal time in this manner. E. Coss was then out on worker's comp for surgery and recovery until March of 2012. This type of injury is caused by repetitive motion, and had begun to develop after management had assigned E. Coss to strenuous tasks in retaliation for his activities.

137.    On or about September 27, 2011, Markiewicz told E. Coss that he had to have a note from his bank to show that that is why he had to take the time off. To Plaintiffs' knowledge, other employees were not required to produce notes for similar time off.

35

138.       Beginning on or about October 4, 2011, A. Coss began to be assigned exclusively to foundations work, back filling, and digging graves – all physically taxing jobs considered among the least desirable, He was assigned to this work for rest of the year 2011. In addition, for the rest of the year, he was often isolated from other employees and made to work alone.

139        On or about November 7, 2011, A. Coss filed a complaint of racial discrimination and retaliation, describing how he had been denied training opportunities, he had been isolated from others, and denied opportunities for promotion.

140.       On or about November 30, 2011, A. Coss told Horvath he felt targeted. Horvath responded by criticizing A. Coss's work.

141.       On or about December 1, 2011, A. Coss told Horvath that he was being treated differently because of the color of his skin.

142.       On or about December 6, 2011, Horvath began to accuse A. Coss of being racist. He called him "prejudiced" and accused him of not helping an African-American co-worker named Matthew Hall "because he's black." This accusation was untrue. On information and belief, these accusations that A. Coss was a racist were intended to discredit him with his co-workers.

143.       On or about December 31, 2011, A. Coss reported for Saturday overtime. Due to the hostility fomented by management against A. Coss, the Grave Diggers refused to work with him for fear that they would be retaliated against if they were seen with him and that they would be subject to over-supervision if they worked alongside him. A. Coss was assigned to work with employee Rademas Irrizary leveling dirt piles by hand. These dirt piles contained many boulders. On this day, during this work, he injured his back again and was unable to return to work until March 12, 2012. He got treatment from medical and chiropractic doctors during this

36

time.

144.     On or about March 9, 2012, E. Coss returned to work after surgery on his wrist. While he had been assigned to driving a pro-gator before, when he returned he was reassigned to both driving a pro-gator and manual labor, though this was not the position that he had bid for and won. He requested an accommodation because of the pain that the repetitive manual labor tasks caused his wrist; he continued to request accommodations throughout early 2012 but was never given an accommodation. He then wrote a letter to Woodlawn's board, describing the incidents of race discrimination, retaliation, and death threats. Throughout the rest of the month, he was called in frequently to the office, where management complained about his work performance.

145.     In or around March of 2012, management began to talk about more lay-offs. On or about March 14, 2012 Miguel Gomez told A. Coss that he would kill anyone who got him laid off. Gomez told A. Coss that if he (Coss) kept complaining, there would be more layoffs. Gomez told A. Coss that he (Gomez) could do whatever he wanted and management did not follow him because he did whatever they wanted and didn't complain. Later that day, Gomez complained to Brown that he was not being trained. When Brown asked if Gomez wanted him to talk to Scheer regarding this, Gomez said no because he was scared.

146.     Throughout the Spring of 2012, E. Coss, and Brown continued to file grievances regarding denial of overtime.

147.     On or about March 22, 2012, all four plaintiffs filed an NLRB complaint about the retaliatory treatment they had suffered due to their opposition to discrimination.

148.     On or about March 26, 2012, coworker Miguel Gomez told A. Coss that another

37

layoff was in the works. He said that they were planning to lay off six people, and were "coming to get" him (A. Coss), E. Coss, and Todd because of their complaints.

149.     On or about March 28, 2012, during a conversation with Gomez, Gomez told A. Coss that he knew that if he had complained like the Cosses and Brown had, he would be over supervised and "given a hard time." Gomez then said that he had learned that he had to ignore the discrimination or else "life would be hard for him." He stated that people who "opened their mouths" get harder work.

150.     On or about May 24, 2012, Brown and E. Coss filed a group grievance signed by Brown, A. Coss, E. Coss, and Russo, which included a written detailed account of hostile work environment through disparate treatment and coercion and retaliation against those who spoke out against discrimination. Approximately twenty minutes after submitting the grievance, Brown and A. Coss were called into the office and notified that they were being laid off. A union grievance was filed protesting these layoffs.

151.     On or about October 11, 2012, E. Coss submitted a request for intermittent FMLA leave to get treatment from a psychotherapist.

152.     On or about October 16, 2012, E. Coss was questioned about his request for FMLA leave.

153.     On or about October 17, 2012, E. Coss had been assigned to dig a grave in an unstable area of Woodlawn. While digging, the earth collapsed beneath his feet and he fell into the open grave, sustaining injuries to his back, shin, and shoulders. At the time of the accident, he called for Horvath, who was at the site, to help him. Instead of helping him, Horvath drove away in his truck. E. Coss had managed to drag himself out of the hole when Minelli arrived to

38

help him.

154.    On or about October 19, 2012, E. Coss went out on worker's comp due to his injuries. He has been unable to work since that time.

### RETALIATION AGAINST FRANK RUSSO

155.    Russo began working as a general employee for Woodlawn as a teenager in 1975. He received promotions to Foundation Mower Shop and Heavy Equipment Mechanic between 1975 and 1999.

156.    In 1999, he was promoted to the position of Crematory Operator. He was qualified and certified for this position.

157.    On or about April 19, 2004, Russo was diagnosed with a brain tumor.

158.    On or about June 10, 2004, Russo underwent surgery to remove the brain tumor. He was out of work for approximately six months. Starting at this time, he began to use both vacation days and time to which he was entitled under the FMLA to see doctors.

159.    In or around 2006, Russo's brain tumor returned. He was able to continue to work with the reasonable accommodation of granting him intermittent time off to visit doctors in order to monitor his condition.

160.    Beginning in 2009, Russo started telling Woodlawn's lawyer about racism and discrimination at Woodlawn.

161.    Shortly after his conversation with the attorney, Popoli began visiting the crematory four or five times a day. Upon information and belief, the purpose of these visits was to intimidate Russo. Popoli would harass him every day, including looking for mistakes that did not exist.

162.     In or around June of 2010, Russo participated in the investigation of race discrimination at Woodlawn conducted by attorney Ernest Collazo at the behest of management. However, Russo spoke truthfully about the instances of discrimination he had witnessed at Woodlawn, including times when he had heard members of management call African-American workers "n----r."

163.     On or about August 17, 2010, Russo was suspended. Management gave the reason he was suspended was that he had used too many FMLA days. Despite management's claims, Russo had not taken any more days during 2010 than he had in any year since his diagnosis in 2004. They informed him that, since Williams had retired from his position as Vice President, FMLA days would not "roll over" year to year. Russo requested documentation of this. To date Russo has not received any documents. Upon information and belief, this reason was a pretext and Russo was suspended in retaliation for his opposition to race discrimination.

164.     In late October of 2010, Russo participated in the demonstration protesting discrimination at Woodlawn and was interviewed by a Daily News reporter. On or about October 24, 2010, Russo was quoted in a Daily News article describing the racism at Woodlawn.

165.     Shortly thereafter, management demoted Russo from Crematory Operator to Vault Cleaner. Management stated that it was concerned about Russo's ability to perform his job due to his brain tumor. However, Russo had had a brain tumor since 2004 and had been performing his duties as Crematory Operator without incident since that time.

166.     Among Russo's symptoms are sensitivity to noise and cold, occasional seizures, and anxiety. His seizures are infrequent, but are brought on by stress. He was able to perform his duties as Crematory Operator because the workplace was heated, quiet, and frequented by others

so that if he had a seizure, somebody would be able to help him. His duties as Vault Cleaner, by contrast, forced him to work alone in the cold and without a cell phone. When he worked as a Vault Cleaner, he was afraid of having a seizure and becoming incapacitated where nobody would find him.

167.     In or around February of 2011, Russo's doctor wrote a note to Woodlawn stating that he is capable of going back to work in the crematory. He was not reinstated.

168.     In or around September of 2011, Russo received a paycheck that did not contain his Labor Day holiday pay. Scheer told him that this was due to a computer glitch. To Russo's knowledge, other employees received their holiday pay during that pay period.

169.     While Russo was paid at the same rate as Vault Cleaner as he had been when he was Crematory Operator, he would receive tips and overtime when he worked as Crematory Operator. He received neither of these things when he worked as a Vault Cleaner. Additionally, during this time, he was not given work on Saturdays, as he had been accustomed to. For these reasons, Russo suffered financially from his demotion. He was forced to file for bankruptcy in or around September 2011, and was reduced to pawning family jewelry to make ends meet.

170.     After his demotion to Vault Cleaner, Russo was singled out by Scheer, foremen, and other employees for the worst assignments and was constantly harassed. These assignments included cleaning mausoleums that had not been cleaned in years, were dark, with very low temperatures in the winter. Sometimes he was assigned to work outside in the rain without any gear.

171.     To Russo's knowledge, while Russo worked as a Vault Cleaner, other employees who were not qualified to work in the Crematory were performing his former job duties. In order

41

to work in the Crematory, an employee would have to be a certified Crematory Operator or else training for their certification. Upon information and belief, the workers who replaced Russo were neither. Although management claimed Russo was taken out of the Crematory because management wanted to rotate the job, on information and believe they did not rotate the job and currently have assigned Dominic Bartolini to the Crematory full time.

172.      To Russo's knowledge, the quality of services provided by the Woodlawn Crematory has decreased since Russo was demoted.

173      Ramon Jimenez reported he received many calls from funeral directors in the area who wanted to intervene to try to get Russo his job back given how well he serviced the funeral directors and their families. Many local funeral directors have also written letters to Woodlawn asking for Russo to be reinstated, praising the quality of his work. Russo treated the customers with loving care.

174.      For these reasons, it is apparent that concerns about Russo's ability to do his work as Crematory Operator are pretextual.

175.      Russo's demotion to Vault Cleaner has caused his medical condition to be exacerbated such that he has been forced to take disability leave from Woodlawn starting in or around August of 2012.

176.      Due to the financial hardship of being on disability which paid only a few hundred dollars a month, Russo applied for social security disability and when he was approved, he was required to retire and take a much reduced pension.

## COUNT I: RETALIATION IN VIOLATION OF 42 USC § 1981, 42 USC §2000e *et. seq.,* N.Y. EXEC. LAW §§290, 296 AND NEW YORK CITY ADMINISTRATIVE CODE §§8-107(7) AGAINST ALL PLAINTIFFS

177.     Plaintiffs repeat and re-allege 1 – 176 as though fully set forth herein.

178.     Plaintiffs engaged in protected activity by opposing discrimination in the workplace, as described in paragraphs 32, 35, 36, 48, 50, 55-57, 61, 64, 66, 82, 84, 101-102, 109-110, 114, 125, 139-141, 146-147, 150, 160, 162, and 164.

179.     Based on those allegations, defendants retaliated against plaintiffs for this protected activity as described in paragraphs 37, 38, 43-45, 47, 49, 53-54, 58-60, 62-63, 67-68, 70-73, 75-77, 80, 83, 86-88, 90-100, 118-120, 122, 126, 128, 130-133, 136-138, 143-145, 140, 161, 163, 165-170 in violation of 42 USC §1981, N.Y. Exec. Law §§290, 296 and York City Administrative Code §§8-101.

### COUNT II: RACIAL DISCRIMINATION IN VIOLATION OF 42 USC §1981, 42 USC §2000e *et seq.,* N.Y. EXEC. LAW §§290, 296 AND NEW YORK CITY ADMINISTRATIVE CODE § 8-107(1)(a) AGAINST PLAINTIFFS BROWN, A. COSS, AND E. COSS

180.     Plaintiffs repeat and re-allege paragraphs 1 – 176 as though fully set forth herein.

181.     Based on those allegations, defendants discriminated against plaintiffs and subjected them to a continuously hostile work environment because of their race and/or national origin, as described in paragraphs 3, 29, 33-34, 38-39, 42, 46-48, 53-54, 55, 58, 62-63, 69, 73, 81, 93-100, 101, 115, 117-118, 128, 129, and 145,  in violation of 42 USC §1981, 42 USC §2000e *et seq.,* N.Y. Exec. Law §§290, 296 and New York City Administrative Code §8-107(1)(a).

### COUNT III : DISABILITY DISCRIMINATION IN VIOLATION OF N.Y. EXEC. LAW §§ 290, 296 AND NEW YORK CITY ADMINISTRATIVE AGAINST ALL PLAINTIFFS

182.     Plaintiffs repeat and re-allege paragraphs 1 – 176 as though fully set forth herein.

183.     Based on those allegations, despite knowledge that plaintiff suffered from disabilities caused by work-related injuries, defendants failed to accommodate plaintiff's disabilities upon request, as described in paragraphs 84, 127, 145. and 168-169.

184.    Further, plaintiffs intentionally worsened plaintiffs' disabilities by assigning them to tasks which they knew or show have known would aggravate their symptoms, as described in Paragraphs 60, 81, 84, 127, 145, 168-169, and 177.

### PRAYER FOR RELIEF

Wherefore, plaintiffs request the following relief:

185.    Back pay, including all fringe benefits;

186.    Reinstatement with accommodations or front pay, including all fringe benefits;

187.    Compensatory damages for emotional distress and suffering;

188.    Compensatory damages for physical distress and suffering;

189.    Punitive damages;

190.    Attorney's fees and costs;

191.    Such relief as is authorized by federal, state, and city law; and

192.    Awarding plaintiffs such other relief as the court deems just and proper.

### JURY TRIAL

Plaintiffs demand a jury trial for all causes of action and claims for which they have a right to a jury trial.

Dated:      New York, New York
            February 13, 2013

Respectfully Submitted,

Eisner & Mirer, PC
By: Jeanne E. Mirer
113 University Place, 8th Floor
New York, NY 10003
(212) 473-8700
Attorneys for Plaintiffs